**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| VICKIE HAWKINS,<br><br>                    Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, *in her capacity as Acting Commissioner of the Social Security Administration*,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:13-cv-00980-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Vickie Lynn Hawkins filed this action asking the Court[1] to reverse or remand the final agency decision denying her Social Security Income ("SSI") under Title XVI of the Social Security Act, *see* 42 U.S.C. §§ 1381–1383f.  The Administrative Law Judge ("ALJ") determined Ms. Hawkins does not qualify as disabled within the meaning of the Social Security Act.  (Admin. R. Doc. 18, certified copy tr. of R. of admin. proceedings:  Vickie L. Hawkins (hereinafter "Tr. __").)  Based on the Court's careful consideration of the record, the parties' memoranda, and relevant legal authorities, the Court AFFIRMS the Commissioner's decision.[2]

## I.  PROCEDURAL HISTORY

On August 20, 2010, Ms. Hawkins filed for SSI alleging March 26, 2010 as her disability onset date.  (Tr. 18.)  The state agency denied Ms. Hawkins's claims on February 10, 2011, (tr. 59, 65–68), and again upon reconsideration on April 29, 2011, (tr. 58, 77–79).  At Ms.

---

[1] On November 6, 2014, in accordance with United States District Court for the District of Utah General Order 07-001 and Federal Rule of Civil Procedure 73, the parties consented to have this case decided by the undersigned Magistrate Judge.  (ECF No. 21.)

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

Hawkins's request, a hearing before an ALJ took place on August 6, 2012 (the "Hearing").  (Tr. 38–57.)  On August 15, 2012, the ALJ issued a decision denying Ms. Hawkins's claims (the "Decision").  (Tr. 18–32.)  On September 10, 2012, Ms. Hawkins requested the Appeals Council review the Decision.  (Tr. 13.)  The Appeals Council denied Ms. Hawkins's request on August 29, 2013, (tr. 7–11), making the Decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g).  *See* 42 U.S.C. § 1383(c)(3) (stating that judicial review for Title XVI claims follow the procedure set forth in 42 U.S.C. § 405(g)); 20 C.F.R. § 416.1481 ("The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you or another party file an action in Federal district court . . . .").

## II.  FACTUAL BACKGROUND

Ms. Hawkins submitted a variety of medical records in support of her SSI claim.  While Ms. Hawkins does not claim disability onset until March 26, 2010, she includes in her submissions some earlier evaluations that appear to come from an earlier application with the Social Security Administration ("SSA"), including the following from Peter Heinbecker, M.D., and Richard Ingebretsen, M.D., Ph.D.  (*See* Pl.'s Opening Br. 2–3, ECF No. 12 (noting examinations performed in 2008 for Disability Determination Services).)

On March 25, 2008, Dr. Heinbecker interviewed Ms. Hawkins for a mental evaluation at the request of the state agency.  (Tr. 221–27.)  Ms. Hawkins reported going to therapy a few times due to traumatic events and taking medications for depression.  (Tr. 221–22; *but see* tr. 228 (noting Ms. Hawkins takes no medications as of April 2008).)  Ms. Hawkins also stated she has mood swings with daily crying spells, biweekly panic attacks, and poor memory.  (Tr. 223–24.)  Testing revealed Ms. Hawkins had a GAF score of 55.  (Tr. 225.)  When Dr. Heinbecker asked

about Ms. Hawkins's daily routine, she replied that she reads, watches TV, goes to appointments, and sometimes shops. (Tr. 224.) Dr. Heinbecker diagnosed Ms. Hawkins with major depression, recurrent, moderate, but gave her a fair prognosis and concluded that she could handle her own funds. (Tr. 225–26.)

On April 8, 2008, Dr. Ingebretsen physically examined Ms. Hawkins at the request of the state agency. (Tr. 228–31.) Ms. Hawkins reported having chest pains, minor back pain, a thyroid problem, and weak legs that give out on her but had not taken medicine for several years. (Tr. 228.) Ms. Hawkins also reported doing her daily activities independently, including reading, watching TV, cooking, and doing light household chores. (Tr. 229.) Dr. Ingebretsen found Ms. Hawkins had normal range of motion in all joints, with only slight loss of range in her spine, and no tenderness or swelling anywhere on her body. (Tr. 230.) Dr. Ingebretsen also noted Ms. Hawkins could walk unassisted but has difficulty doing so. (Tr. 228–31.)

After making this application for SSI, Ms. Hawkins went through another round of state agency evaluations. On December 4, 2010, Joseph W. Nelson, D.O., physically examined Ms. Hawkins at the request of the state agency. (Tr. 273–79.) Ms. Hawkins complained of back pain, lower extremity swelling, arthritis of her hands and feet, congestive heart failure, peripheral artery disease of her legs, and neuropathy of her lower extremities. (Tr. 273–74.) Ms. Hawkins reported that during a typical day, she watches TV, does crafts, and reads, (tr. 274), and that her hobbies include sewing, (tr. 275). She also reported that her neighbor helps her bathe, and her son helps her with toileting. (Tr. 274.) On examination, Ms. Hawkins had tenderness to palpation along her lower spine, slight pitting edema in her lower extremities, diminished sensation in her feet, and tenderness in her hands but a negative straight leg raise bilaterally and normal range of motion in her wrists and hands. (Tr. 276–77.) Dr. Nelson observed Ms.

Hawkins has difficulty with her gait, but she has no difficulty with the following: using a pen, paper, and clipboard; putting her shoes on and taking them off; dressing and undressing; lifting, carrying, and handling light objects; rising from a sitting or squatting position; and getting on and off the exam table. (Tr. 277.) Dr. Nelson opined that of Ms. Hawkins's physical issues, only her moderate neuropathy affects her ability to work by limiting her ability to ambulate extended distances and over inclined or uneven surfaces and her ability to climb stairs or ladders. (Tr. 278–79.)

On January 19, 2011, John D. Hardy, Ph.D., performed a psychological evaluation of Ms. Hawkins at the request of the state agency. (Tr. 284–87.) Ms. Hawkins reported she had applied for disability benefits for physical reasons, had never been psychiatrically hospitalized, and does not go to counseling or take any psychiatric medications. (Tr. 284–85.) Ms. Hawkins also reported she could use public transportation, do light housekeeping, perform personal care, and cook simple meals but indicated when she went shopping she would return with items different than those she should have gotten. (Tr. 285–86; *see also* tr. 173–74.) In addition, Ms. Hawkins enjoys "'doing jewelry, sometimes for hours.'" (Tr. 285.) She reported her mood as normal but crying or screaming when upset, with occasional depression and suicidal thoughts. (Tr. 285–86*.*) Dr. Hardy noted Ms. Hawkins's average short-term attention, memory, and concentration and diagnosed her with depressive disorder. (*Id.*) Dr. Hardy opined Ms. Hawkins presented as "fairly socially inadequate and [has] difficulty solving day to day problems of life in general." (Tr. 286.) He concluded Ms. Hawkins has "*Inadequate Personality* where she simply doesn't have the adaptive skills to manage her life in a particularly successful fashion although she does have a modicum of skills that allows her to *get by*," including the rudimentary ability to manage funds. (Tr. 286–87; *see also* tr. 174.)

In May and June 2011, Ms. Hawkins visited the University of Utah Clinic because of an abscess, sore throat, and foot pain.  (Tr. 385–401.)  Both times, the doctor found her extremities normal with full range of motion.  (Tr. 387, 398.)  The records never make any mention of back pain, numbness, or frequent falling.  On February 7, 2012, Ms. Hawkins presented to the Emergency Department of Pioneer Valley Hospital with general weakness after a fall earlier in the day, (tr. 358), but the doctor found her back and extremities normal, (tr. 363).  The doctor diagnosed her with hypokalemia.  (Tr. 360.)  A CT scan of Ms. Hawkins's cervical spine that day revealed degenerative changes in the facet joints at the C3/C4 and C4/C5 levels and degenerative disc disease changes "most pronounced" at the C6/C7 level with "moderate loss of disc space."  (Tr. 375.)

On April 25, 2012, Ms. Hawkins started seeing Bireen L. Whitten, M.D., for general treatment of her medical problems.  (Tr. 327.)  Dr. Whitten opined Ms. Hawkins has low back pain with parathesias and weakness, depression, allergies, hypertension, hypothyroid, headache, prediabetes, and hyperlipidemia.  (Tr. 329.)  At this visit, Dr. Whitten ordered a low back X-ray that showed congential fusion of the L4 and L5 vertebral bodies and lower lumbar degenerative change.  (Tr. 329, 331.)  Dr. Whitten referred Ms. Hawkins to another doctor for an electrodiagnostic evaluation of her bilateral lower extremities.  (Tr. 320, 329.)  The referred doctor observed Ms. Hawkins has a slow, antalgic gait but could ambulate well without an assistive device.  (Tr. 321.)  He also noted Ms. Hawkins has decreased range of motion in her lumbar spine and diminished sensation in her legs.  (*Id.*)  The evaluation suggested Ms. Hawkins has mild early sensory peripheral polyneuropathy but does not meet "full diagnostic criteria." (Tr. 322.)  During two visits in May 2012, Dr. Whitten noted that Ms. Hawkins still suffers from the same issues as her prior April visit.  (Tr. 317–18, 352–53.)  On June 4, 2012, Ms. Hawkins

had Dr. Whitten complete paperwork for her social security application, which led Dr. Whitten to note:

> [Ms. Hawkins] seems to have a fairly low level of [cognitive] functioning, which may be considered in her application for social security disability. . . .   I do not think her leg symptoms preclude her from working, especially due to the lack of severity on Xray and nerve conduction studies.  Certainly she also has depression, which could manifest as memory difficulty and cognitive impairment.  I am recommending that she undergo more formal cognitive evaluation.

(Tr. 349.)  Dr. Whitten also noted Ms. Hawkins paid her own bills when she had the financial means to do so.  (Tr. 347.)

Following up on that recommendation, in July 2012, a psychologist, Ralph W. Gant, Ph.D., performed an evaluation on Ms. Hawkins.  (Tr. 403–18.)  Ms. Hawkins received a full-scale IQ score of seventy-five, placing her in the borderline range of intellectual functioning. (Tr. 407.)  Testing also revealed that Ms. Hawkins has reading, math, and writing disorders, (tr. 414), with poor attention and memory, (tr. 408).  As of that evaluation, Ms. Hawkins had a GAF of forty-two.  (Tr. 415.)  Dr. Gant diagnosed Ms. Hawkins with post-traumatic stress disorder, chronic; major depressive disorder, recurrent/severe with psychotic features; and panic disorder without agoraphobia.  (Tr. 414.)  Dr. Gant concluded Ms. Hawkins could not do productive work for at least the next year.  (*Id.*)

At the Hearing on August 6, 2012, Ms. Hawkins testified she could not work because she has trouble with her legs, her concentration, and her memory.  (Tr. 43.)  Ms. Hawkins reported falling down once or twice a week because her legs give out on her.  (Tr. 44.)  She cannot sit for very long and can stand for a couple of hours at one time.  (Tr. 47.)  Additionally, Ms. Hawkins purports to have difficulty understanding and remembering simple instructions, (tr. 49), and she cannot maintain a schedule or arrive on time for appointments, (tr. 50).  Ms. Hawkins graduated from high school after completing special education in remedial reading.  (Tr. 44.)  Ms. Hawkins

currently lives with her son, who helps her bathe and cook.  (Tr. 45.)  During the day, Ms. Hawkins mostly lays down and watches TV because she cannot stand or sit without too much pain.  (Tr. 46.)  Ms. Hawkins reported hearing voices and frequently arguing with people.  (Tr. 48–49.)  The vocational expert opined that someone in Ms. Hawkins's position could perform unskilled light occupations, such as small products assembler, gluer, and inspector and hand packager, even with various limitations.  (Tr. 53–55.)  The ALJ denied Ms. Hawkins's application on August 15, 2012.  (Tr. 18–32.)

Following the Decision, on October 30, 2012, Dr. Whitten completed a Medical Statement noting she saw Ms. Hawkins last on June 4, 2012.  (Tr. 420–24.)  In the Medical Statement, Dr. Whitten indicates she has extensively reviewed Ms. Hawkins's medical records and opines that Ms. Hawkins has major depressive disorder, panic disorder, mild mental retardation, and reading, math, and writing disorders.  (Tr. 420–22.)  Dr. Whitten opined that Ms. Hawkins's mental and physical limitations preclude Ms. Hawkins from regularly performing an eight-hour work day, five days a week in several ways.  (*Id.*)  Dr. Whitten also opined that Ms. Hawkins's chronic pain and major depression cause Ms. Hawkins not to be able to work or stand.  (Tr. 424.)  Further, Dr. Whitten opined that Ms. Hawkins can sit for no more than fifteen minutes at a time and can lift no more than five pounds.  (*Id.*)

On December 21, 2012, Dr. Whitten provided a letter summarizing Ms. Hawkins's physical impairments, stating that Ms. Hawkins has "symptoms of leg weakness and numbness," "her legs [give] out on her periodically," and she complains about lower back pain and generalized pain.  (Tr. 426.)

### III.  STANDARD OF REVIEW

42 U.S.C. § 405(g) provides for judicial review of a final decision of the Commissioner of the SSA.  This Court reviews the Commissioner's decision to determine whether substantial evidence in the record supports the Commissioner's factual findings and whether the Commissioner applied the correct legal standards.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). [3]  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. § 405(g).  Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence.  *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).  The standard "requires more than a scintilla, but less than a preponderance."  *Lax*, 489 F.3d at 1084 (citation omitted).  "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."  *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation marks and citation omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," it "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citation omitted), but "review only the *sufficiency* of the evidence," *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (citation omitted).  The court does not have to accept the Commissioner's findings mechanically, but should "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met."  *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks

---

[3] Courts apply the same analysis in determining disability under Title II and Title XVI.  *House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

and citation omitted).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence," and the court may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  *Lax*, 489 F.3d at 1084 (alteration in original) (internal quotation marks and citation omitted).

In addition to a lack of substantial evidence, the reviewing court may reverse where the Commissioner uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## IV.  ANALYSIS

The Social Security Act ("Act") defines a "disabled individual" as a person who "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  Moreover, an individual is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. 20 C.F.R. § 416.920(a)(1).  The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;

    (2) The claimant has a medically severe physical or mental impairment or combination of impairments;

    (3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which precludes substantial gainful activity;

    (4) The impairment prevents the claimant from performing his past work; and

    (5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his age, education, and work experience.

*See* 20 C.F.R. § 416.920(a)(4) (outlining the five-step sequential evaluation); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (citations omitted) (same).  The claimant bears the initial burden of establishing his disability in the first four steps.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy.  *Id.*

    The ALJ evaluated Ms. Hawkins's claims through step five, making the following findings of fact and conclusions of law with respect to Ms. Hawkins:

    1.    "[Ms. Hawkins] has not engaged in substantial gainful activity since August 20, 2010, the application date (20 CFR 416.971 *et seq.*)."  (Tr. 20.)

    2.    "[Ms. Hawkins] has the following severe impairments:  mild degenerative disc disease of the lumbar spine (e.g., see Ex. 6F, pg. 6); degenerative disc disease of the cervical spine (e.g., see Ex. 26F, pgs. 11-12); mild peripheral neuropathy (e.g., see Ex. 24F, pg. 3); depressive disorder NOS vs. major depressive disorder (e.g., see Exs. 17F, pg. 3; 28F, pg. 13); mild mental retardation with reading, mathematics and written expression disorders (e.g., see Ex. 28F, pg. 13); post traumatic stress disorder (e.g., see Ex. 28F, pg. 13); and, panic disorder (e.g., see Ex. 28F, pg. 13).  (20 CFR 416.920(c))."  (*Id.*)

    3.    "[Ms. Hawkins] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)."  (Tr. 21.)

    4.    "[Ms. Hawkins] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can walk no more than a total of two hours during an 8-hour workday, she can do no more than occasional walking over rough or uneven surfaces, she can occasionally climb ramps or stairs and she can never climb ladders, ropes or scaffolds. Due to pain, side effects of medications and mental impairments, [Ms. Hawkins] can only make simple work-related judgments and decisions, she can understand, remember, and carry out only short and simple instructions, she can deal with no changes in a routine work setting, she

can perform no fast paced work, but can do goal-oriented work, and she has no more than level 2 reasoning and languages skills and level 1 math development skills, as defined in the Dictionary of Occupational Titles (D.O.T.)." (Tr. 23.)

5.    "[Ms. Hawkins] is unable to perform any past relevant work (20 CFR 416.965)." (Tr. 30.)

6.    "[Ms. Hawkins] was born on October 26, 1957 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963)." (Tr. 31.)

7.    "[Ms. Hawkins] has a high school education and is able to communicate in English (20 CFR 416.964)." (*Id.*)

8.    "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Ms. Hawkins] is 'not disabled,' whether or not [Ms. Hawkins] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)." (*Id.*)

9.    "Considering [Ms. Hawkins's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Ms. Hawkins] can perform (20 CFR 416.969 and 416.969(a))." (*Id.*)

10.   "[Ms. Hawkins] has not been under a disability, as defined in the Social Security Act, since August 20, 2010, the date the application was filed (20 CFR 416.920(g))." (Tr. 32.)

In short, the ALJ concluded that Ms. Hawkins does not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; Ms. Hawkins has the residual functional capacity ("RFC") to perform unskilled light work as defined in the Act with some modifications; and jobs exist in the national economy in significant numbers that Ms. Hawkins could perform given her limitations. (Tr. 21–32.)

In support of her claim that this Court should reverse or remand the Commissioner's decision, Ms. Hawkins argues the ALJ erred: (1) by failing to consider properly whether her impairments meet or equal a listed impairment; (2) by improperly evaluating the opinion evidence; (3) by improperly evaluating her credibility; and (4) by improperly determining her RFC and thus improperly determining her ability to perform other work. (Pl.'s Opening Br. 11–

20, ECF No. 12.)  Ms. Hawkins also argues the Appeals Council failed to consider the new

evidence she submitted when it reviewed the Decision.[4]  (*Id.* at 20–21.)

### A.  Listing of Impairments Consideration

Ms. Hawkins argues the ALJ erred at step three by finding she did not meet or equal any

impairment in the Listing of Impairments ("the Listings"), especially listings 12.04 Affective

Disorders and 12.05 Intellectual Disability.  (Pl.'s Opening Br. 11–13, ECF No. 12.)  The Court

disagrees.

20 C.F.R. Part 404, Subpart P, Appendix 1 lists impairments that preclude substantial

gainful employment.  *See* 20 C.F.R. § 416.925(a) (describing the purpose of the Listings).  The

claimant bears the burden of showing her impairment meets or equals the requirements of a

listed impairment.  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).  For an ALJ to

find a claimant meets a listing, the claimant's impairment must "satisf[y] all of the criteria of that

listing, including any relevant criteria in the introduction, and meet[] the duration requirement."

20 C.F.R. § 416.925(c)(3).  If a claimant's impairment does not meet a listing, her impairment

may constitute the medical equivalent if she has "other findings related to [her] impairment that

are at least of equal medical significance to the required criteria."  20 C.F.R. § 416.926(b)(1)(ii).

The ALJ must also consider the combined effect of all the claimant's impairments.  *See* 20

C.F.R. § 416.923 ("If [the SSA] do[es] find a medically severe combination of impairments, the

combined impact of the impairments will be considered throughout the disability determination

process.").

---

[4] By making only these arguments in her opening brief, Ms. Hawkins waives any additional
challenges to the ALJ's decision.  *See Anderson v. Dep't of Labor*, 422 F.3d 1155, 1182 n.51
(10th Cir. 2005) (waiving argument claimant did not first raise in her opening brief).

Where the claimant does not meet or equal a listing the ALJ must "discuss the evidence and explain why he found that [claimant] was not disabled at step three." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (citations omitted).  But inadequate analysis at step three may constitute harmless error if the "ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment." *Fischer-Ross*, 431 F.3d at 733.  In general, a court may find an error harmless when "based on material the ALJ did at least consider (just not properly), [it] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id.* at 733–34 (internal quotation marks and citation omitted).

The ALJ not only considered listings 12.04 Affective Disorders and 12.05 Intellectual Disability in the Decision, but also listings 1.04 Disorders of the Spine, 11.14 Peripheral Neuropathies, and 12.06 Anxiety-Related Disorders.  (Tr. 21–23.)  Ms. Hawkins contends "[t]he ALJ failed to discuss the evidence he reviewed."  (Pl.'s Opening Br. 11, ECF No. 12.)  Although the ALJ did not lay out all the evidence he relied on in this particular section, he continually directed the reader to the next section for such evidence.  (Tr. 22–23 (using phrases like "as further borne out below in the description of medical evidence in Finding No. 4" and "as detailed below in Finding No. 4").)  Finding No. 4 includes a detailed two-and-a-half-page description of Ms. Hawkins's testimony and medical history with results from each examination done before the Hearing.  (Tr. 24–26.)

### 1. Physical Impairments

The ALJ first considered listings 1.04 Disorders of the Spine and 11.14 Peripheral Neuropathies to address Ms. Hawkins's physical impairments.  (Tr. 21–22.)  The ALJ

acknowledged Ms. Hawkins's history of back pain due to degenerative disc disease and leg numbness and weakness but concluded that she did not meet the two listings because the effects of her impairments did not match the severity of the criteria listed.  (Tr. 22.)  Under Finding No. 4, the ALJ's review of the medical records reveals no medical examination showing nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication required to show a disorder of the spine under 20 C.F.R. pt. 404, subpt. P, app. 1, listing 1.04, or "[s]ignificant and persistent disorganization of motor function in two extremities" required to show peripheral neuropathies, *see* 20 C.F.R. pt. 404, subpt. P, app. 1, listing 11.14 (redirecting reader to paragraph B of listing 11.04).  Instead, Ms. Hawkins's medical records document mild degenerative disc disease, some decreased range of motion in her lumbar spine, and mild early sensory peripheral polyneuropathy.  (Tr. 25.)  With this discussion of the listings and the evidence, this Court finds the ALJ did discuss the evidence he reviewed with respect to Ms. Hawkins's physical impairments.  Furthermore, the ALJ found Ms. Hawkins could still ambulate without assistance, do crafts, and sew, (tr. 25), facts all borne out by substantial evidence in the record, (tr. 274–75, 278–79, 285, 321, 365, 387, 398).

While Dr. Whitten subsequently opined that Ms. Hawkins cannot stand at all, can only sit for fifteen minutes at a time, and can only lift five pounds, (tr. 424), nothing in the record supports these findings.  First, Dr. Whitten made these conclusions based on the same medical record the ALJ reviewed as evidenced by her notation that she last saw Ms. Hawkins on June 4, 2012, prior to the Hearing.  (*Cf.* tr. 420 *with* tr. 40.)  Second, Dr. Whitten's new opinion provides no objective evidence to contradict the ALJ's discrediting of Ms. Hawkins's claims of repeated falling.  (Tr. 27.)  Only one record of a doctor's visit reporting a fall exists, and the attending physician attributed that fall to hypokalemia, not any neurological findings.  (Tr. 360.)

Moreover, Ms. Hawkins herself testified she could stand for a couple of hours.  (Tr. 47–48.)  As to lifting, Ms. Hawkins can shop.  (Tr. 45–46.)  The problem impacting her shopping ability is her likelihood of returning with the wrong items, not her inability to lift items.  (*Id.*)  Because Ms. Hawkins could function at this level, even the combination of all her physical and mental impairments do not equal the level of disability required by the listings.

## 2.  Mental Impairments

The ALJ then compared Ms. Hawkins's mental impairments to listings 12.04 Affective Disorders, 12.05 Intellectual Disability, and 12.06 Anxiety-Related Disorders.  (Tr. 22–23.)  Listing 12.04 requires Ms. Hawkins meet the criteria in paragraphs A and B or the criteria in paragraph C.  20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.04.  The ALJ failed to discuss how Ms. Hawkins meets the requirements of paragraph A.  (*See* tr. 22.)  Instead, the Decision skips to paragraphs B and C.  (*Id.*)  To determine whether this error is harmless, the Court looks to other findings in the record.  *Fischer-Ross*, 431 F.3d at 733–34.  Because listing 12.04 requires Ms. Hawkins to meet both paragraphs A and B to qualify, if Ms. Hawkins does not meet paragraph B, then any failure to discuss paragraph A remains harmless.

To meet paragraph B, Ms. Hawkins must show her mental health symptoms "result[] in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration."

20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.04(B).  The ALJ concluded that, based on her medical record, Ms. Hawkins's mental impairments place moderate limitations on her activities of daily living and on her concentration, persistence, and pace; cause mild difficulties in

maintaining social contact; and trigger no episodes of decompensation.  (Tr. 22.)  In making this finding, the ALJ again incorporated his later findings from Finding No. 4.  (*Id.*)

In Finding No. 4, the ALJ discussed Ms. Hawkins's testimony and the medical evidence showing Ms. Hawkins has a history of depression and intellectual functioning difficulties.  (Tr. 25–26.)  The ALJ noted Ms. Hawkins reported a normal mood, and although she cries when frustrated and has occasional suicidal thoughts, she has never been psychiatrically hospitalized and has only recently started taking psychiatric medication.  (Tr. 25–27.)  The ALJ also recognized the record shows Ms. Hawkins can still care for herself, use public transportation, do household chores, make simple meals, and do crafts for hours.  (Tr. 26.)  These detailed findings make any failure to discuss the evidence under Finding No. 3 harmless.  These subsequent findings also support the ALJ's earlier finding that Ms. Hawkins could not meet paragraph B because she only has moderate--not marked--limitations on her activities of daily living; mild--not marked--difficulties in social functioning; moderate--not marked--difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation.  Therefore, Ms. Hawkins does not exhibit any, let alone two, of the four criteria required to meet listing 12.04 Affective Disorders through paragraphs A and B.  Thus, the Court finds the ALJ's lack of paragraph A findings as to listing 12.04 Affective Disorders harmless.

The ALJ also relied on these findings to conclude Ms. Hawkins could not meet paragraph C of listing 12.04 Affective Disorders.  (Tr. 22.)  To meet paragraph C, Ms. Hawkins must have a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities" and either "repeated episodes of decompensation, each of extended duration; . . . [a] residual disease process . . . [where] even a minimal increase in mental demands or change in the environment

would . . . cause the individual to decompensate; or [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement." 20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.04(C).  The findings laid out above show Ms. Hawkins also does not meet paragraph C.  Thus, the ALJ correctly found Ms. Hawkins did not meet listing 12.04 Affective Disorders under the paragraph C criteria.  (Tr. 22.)

Listing 12.05 Intellectual Disability requires Ms. Hawkins meet the criteria in either paragraphs A, B, C, or D.  20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.05.  To meet paragraph A, Ms. Hawkins must have a "[m]ental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and [an] inability to follow directions." 20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.05(A).  Based on the activities Ms. Hawkins could still do, as set forth above, the ALJ found Ms. Hawkins "retains adequate ability to perform at least light work and retains adequate ability to focus and attend to perform simple work."  (Tr. 26.)  Therefore, the ALJ concluded Ms. Hawkins did not meet paragraph A.  (Tr. 23.)

To meet paragraph B, Ms. Hawkins must have "[a] valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.05(B).  To meet paragraph C, Ms. Hawkins must have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.05(C).  Finally, paragraph D requires Ms. Hawkins's "valid verbal, performance, or full scale IQ of 60 through 70" to "result[] in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration."

20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.05(D).  Because Ms. Hawkins scored seventy-five on a full-scale IQ test, (tr. 26), the ALJ concluded she did not meet paragraphs B or C, (tr. 23).  Additionally, because paragraph D is identical to paragraph B of listing 12.04 Affective Disorders, the ALJ used the same reasons as before to support his finding that Ms. Hawkins did not meet paragraph D.  (*See* tr. 22–23.)  Thus, the ALJ found that the record, as described in Finding No. 4, does not show Ms. Hawkins meets listing 12.05 Intellectual Disability.  (Tr. 23.)

Listing 12.06 Anxiety-Related Disorders requires Ms. Hawkins meet the criteria of paragraphs A and B or the criteria of paragraphs A and C.  20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.06.  Again, the ALJ did not discuss paragraph A of listing 12.06 Anxiety-Related Disorders.  (*See* tr. 22–23.)  However, if Ms. Hawkins cannot meet paragraphs B or C of listing 12.06, then any failure to discuss paragraph A becomes a harmless error since Ms. Hawkins must meet either paragraphs A and B or paragraphs B and C to qualify.

To meet paragraph B, Ms. Hawkins must show her anxiety "result[s] in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration."

20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.06(B).  As noted above, the ALJ found that all of Ms. Hawkins's mental impairments combined do not interfere with her life to the level required by paragraph B, let alone just her anxiety.  (Tr. 22–23.)

The ALJ also found Ms. Hawkins does not meet paragraph C of listing 12.06.  (Tr. 22.)  To meet paragraph C, Ms. Hawkins's anxiety must "[result] in complete inability to function independently outside the area of [her] home."  20 C.F.R. pt. 404, subpt. P, app. 1, listing

-18-

12.06(C).  As set forth above, the evidence discussed by the ALJ under Finding No. 4 supports

the ALJ's finding that Ms. Hawkins can function independently outside her home.  Specifically,

Ms. Hawkins can use public transportation and shop.  (Tr. 26.)  The ALJ discussed the evidence

he reviewed to make both findings under Finding No. 4.  Thus, any error to discuss that evidence

under Finding No. 3 reflects harmless error.

      Finally, the ALJ considered the issue of medical equivalence when he looked at all of

Ms. Hawkins's physical or mental impairments together rather than separately and their overall

impact on Ms. Hawkins's daily life.  Throughout the ALJ's analysis of the listings, the ALJ

continually refers to "claimant's . . . impairments."  (*See* tr. 21–23.)  Central to any equivalent to

either listing 12.04 Affective Disorders or listing 12.05 Intellectual Disability is the finding that

the mental impairments cause marked restrictions of daily living and/or marked difficulties in

maintaining social functioning, concentration, persistence, or pace, or that they cause the

claimant to have to depend on others for basic personal needs and cannot follow directions.

Even when the ALJ combined the effects of Ms. Hawkins's impairments, the ALJ found Ms.

Hawkins could do many things on her own.  Ms. Hawkins's level of daily functioning prevents

her from showing the combination of her impairments equals the severity of these other two

listings.

      Ms. Hawkins also argues that the ALJ failed to get an updated medical opinion on the

issue of medical equivalence.  (Pl.'s Opening Br. 12–13, ECF No. 12.)  While the Court agrees

the ALJ did not get an updated medical opinion, the Court disagrees that the ALJ needed to get

one.  The ALJ must get an updated medical opinion on equivalency in only two circumstances:

> When no additional medical evidence is received, but in the opinion of the
> administrative law judge or the Appeals Council the symptoms, signs, and
> laboratory findings reported in the case record suggest that a judgment of
> equivalence may be reasonable; or

> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

SSR 96-6p, 1996 WL 374180, at *3–4 (July 2, 1996).

The ALJ received additional medical evidence after the state agency's reconsideration determination but concluded the new evidence did not change the state agency consultants' findings that Ms. Hawkins's impairments do not equal a listed impairment.  (Tr. 30.)  Several state agency consultants reported Ms. Hawkins's impairments as non-severe, necessarily implying they would have concluded Ms. Hawkins's impairments do not meet or equal any of the listings.  (Tr. 253, 280, 288, 313, 314.)  While the medical evidence received subsequently does show more severe conditions than found by the state agency consultants, Ms. Hawkins's self-reports and the doctors' subsequent reports show her daily functioning exceeds the level required to meet or equal any of the proposed listings.  Therefore, the ALJ did not need an updated medical opinion on the issue of medical equivalence.

While Dr. Whitten's Medical Statement submitted after the Decision opines that Ms. Hawkins cannot work at all because of her mental health limitations, Dr. Whitten bases her opinion on the same evidence in front of the ALJ at the Hearing.  (Tr. 420–22.)  The primary difference between Dr. Whitten's opinion before the Hearing and her opinion after the Hearing is Dr. Gant's opinion.  Dr. Whitten admitted she last saw Ms. Hawkins before giving this opinion on June 4, 2012.  (Tr. 420.)  At that visit, Dr. Whitten opined that Ms. Hawkins had just started on Celexa, with a recent dosage increase, making the impact of her depression difficult to assess.  (Tr. 349.)  As to cognitive functioning, Dr. Whitten noted that Ms. Hawkins reported being able to pay her own bills, when she has the financial means, (tr. 347), and recommended further

assessment, (tr. 349).  In her October 2012 opinion, Dr. Whitten confirms that prior to forming her opinion she conducted an "extensive review of chart and consultants' note."  (Tr. 422.)  Thus, Dr. Whitten simply renders an opinion on the same evidence the ALJ had in front of him rather than providing new information.  And the main difference between Dr. Whitten's April and October opinions is Dr. Gant's opinion, which the ALJ gave only partial weight.  (Tr. 29.)  Furthermore, whether a claimant can work reflects an issue reserved to the Commissioner.  20 C.F.R. § 416.927(d)(1).  Thus, Dr. Whitten's opinion on Ms. Hawkins's ability to work receives no special significance.  20 C.F.R. § 416.927(d)(3).  For all of these reasons, Dr. Whitten's subsequently submitted materials do not undermine the ALJ's decision.

### B.  Evaluation of the Opinion Evidence

Second, Ms. Hawkins argues the ALJ erred by improperly evaluating the opinions of Dr. Nelson, Dr. Hardy, Dr. Gant, and Dr. Whitten.  (Pl.'s Opening Br. 14–16, ECF No. 12.)  The Court disagrees.

An ALJ must evaluate every medical opinion.  20 C.F.R. § 416.927(c).  If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight.  20 C.F.R. § 416.927(c)(2).  When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors.  Id.  20 C.F.R. § 416.927(c)(2) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (quoting *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)).  To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons' for his decision."  *Drapeau*, 255 F.3d at 1213 (citation omitted).

Yet the ALJ's decision need not discuss explicitly all of the factors for each medical opinion.  *See Oldham*, 509 F.3d at 1258 (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review).  When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies.  *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) (noting that trier of fact resolves conflicts between medical evidence).

Ms. Hawkins claims the ALJ erred by giving great weight to Dr. Nelson's opinion.  (Pl.'s Opening Br. 14, ECF No. 12.)  However, Ms. Hawkins never says how the ALJ erred in giving Dr. Nelson great weight.  (*Id.*)  The Court need not address undeveloped arguments.  *Cross v. Colvin*, No. 12-cv-01722-WYD, 2013 WL 5402056, at *2 (D. Colo. Sept. 26, 2013) (citing *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012)); *see also Anderson v. Colvin*, No. 12-cv-01282-REB, 2013 WL 3216140, at *3 n.3 (D. Colo. June 25, 2013) (declining to consider inadequately briefed and undeveloped arguments).  The ALJ gave great weight to Dr. Nelson's opinion because Dr. Nelson's opinion corresponds with objective medical evidence in the record.  (Tr. 28.)  Although Dr. Nelson concluded Ms. Hawkins has lumbago without radiculopathy, bilateral lower extremity edema, possible heart disease, and moderate neuropathy, he opined that only Ms. Hawkins's moderate neuropathy causes limitations, specifically on her ability to ambulate and climb.  (Tr. 278–79.)  Ms. Hawkins's remaining impairments do not limit her ability to work.  (Tr. 278.)  The ALJ found Dr. Nelson's opinion matches the results of Ms.

Hawkins's medical examinations and her reported activities, which both show, at most, mild limitations on Ms. Hawkins's daily life.  (Tr. 28.)

Substantial evidence in the record supports the ALJ's conclusions that Dr. Nelson's opinion corresponds with objective medical evidence in the record.  After Dr. Nelson's examination, other doctors found Ms. Hawkins's extremities normal, (tr. 363, 387, 398), although Ms. Hawkins had some degenerative changes in her cervical spine, (tr. 375).  In early 2012, an X-ray showed degenerative changes in Ms. Hawkins lumbar spine, (tr. 331), and an electrodiagnostic evaluation of Ms. Hawkins's lower extremities showed possible mild early sensory peripheral polyneuropathy, (tr. 322).  However, Ms. Hawkins could still ambulate without assistance, (tr. 321), and Dr. Whitten thought Ms. Hawkins's "leg symptoms [did not] preclude her from working, especially due to the lack of severity on Xray and nerve conduction studies."  (Tr. 349.)  Additionally, Ms. Hawkins reported doing crafts, (tr. 274), doing light housekeeping, (tr. 285), and shopping, (tr. 174).

The ALJ also gave Dr. Hardy's opinion great weight.  (Tr. 28–29.)  Contrary to Ms. Hawkins's argument, (Pl.'s Opening Br. 14–15, ECF No. 12), the ALJ did not mischaracterize Dr. Hardy's opinion when he stated Dr. Hardy "opined [Ms. Hawkins] had poor adaptive abilities, but . . . she did have a certain degree of skills and a rudimentary ability to manage funds," (tr. 28).  Ms. Hawkins claims the ALJ ignored Dr. Hardy's statement that Ms. Hawkins "presented as being fairly socially inadequate and having difficulty solving day to day problems of life in general," (tr. 286).  (Pl.'s Opening Brief 14, ECF No. 12.)  However, Dr. Hardy further stated Ms. Hawkins has a diagnosis akin to "*Inadequate Personality* where she simply doesn't have the adaptive skills to manage her life in a particularly successful fashion although she does

-23-

have a modicum of skills that allows her to *get by.*" (Tr. 286–87.) The ALJ simply summarized both statements and found them "consistent with the rest of the medical evidence." (Tr. 28.)

Again, substantial evidence in the record supports the ALJ's conclusion that Dr. Hardy's opinion corresponds with other record evidence. Dr. Whitten opined Ms. Hawkins had depression, (tr. 329), and referred her to Dr. Gant for a formal psychological evaluation, stating Ms. Hawkins "[c]ertainly . . . has depression, which could manifest as memory difficulty and cognitive impairment," (tr. 349). Results from Dr. Gant's evaluation showed Ms. Hawkins has borderline intellectual functioning; seriously impaired social, occupational, and school functioning; and reading, math, and writing disorders. (Tr. 407–08, 414–15.) Ms. Hawkins also has poor attention and memory. (Tr. 408.) However, Ms. Hawkins could still focus enough to do activities like crafts, reading, and sewing. (Tr. 273–74.)

Ms. Hawkins argues the ALJ should have given Dr. Gant's opinion controlling weight. (Pl.'s Opening Br. 15, ECF No. 12.) However, the ALJ can never give an opinion of a non-treating doctor, like Dr. Gant, controlling weight. SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). The ALJ only gave Dr. Gant's opinion partial weight because only part of Dr. Gant's opinion corresponds with the record. (Tr. 29.) Dr. Gant ultimately opined Ms. Hawkins could not perform long-term productive work for at least the next year. (Tr. 414.) The ALJ noted that although Ms. Hawkins has mood disturbances; concentration and focus problems; and reading, writing, and mathematic disorders, those limitations do not necessarily preclude her from doing full-time work. (Tr. 29.) Ms. Hawkins's daily activities, such as reading and doing crafts, and her rudimentary ability to manage funds show that she can still do very simple work. (*Id.*) As laid out above, the record includes substantial evidence to support these findings.

Ms. Hawkins also argues the ALJ "appear[ed] to reject Dr. Gant's opinion that Ms.
Hawkins is disabled because deciding issues such as these is reserved to the Commissioner."
(*Id.*)  First, the ALJ did not reject Dr. Gant's opinion.  Second, although the ALJ should not have
given that specific opinion any special significance, *see* 20 C.F.R. § 416.927(d)(3) ("We will not
give any special significance to the source of an opinion on issues reserved to the Commissioner
. . . ."), it only comprised one reason the ALJ gave Dr. Gant's opinion partial weight.  As set
forth above, the ALJ had other well-supported reasons for giving Dr. Gant's partial weight.
Thus, the ALJ did not err in giving Dr. Gant's opinion only partial weight.

Ms. Hawkins argues the ALJ misrepresented Dr. Whitten's opinion and "fail[ed] to
acknowledge the level of severity of [the] impairments" Dr. Whitten's opinion addressed.  (Pl.'s
Opening Br. 15–16.)  Dr. Whitten stated Ms. Hawkins has, among other things, "fairly low level
of functioning" and "depression, which could manifest as memory difficulty and cognitive
impairment."  (Tr. 349.)  However, Dr. Whitten also stated she did "not think [Ms. Hawkins's]
leg symptoms preclude her from working."  (*Id.*)  The ALJ directly quoted from Dr. Whitten's
note, (tr. 30), and included several limitations in Ms. Hawkins's RFC due to the physical and
mental impairments Dr. Whitten mentioned, (tr. 23).  Although the ALJ did not explicitly
mention Dr. Whitten wanted Ms. Hawkins to "undergo [a] formal cognitive evaluation" when
analyzing Dr. Whitten's opinion, (*see* tr. 29–30), he did mention it earlier in the Decision, (tr.
26).  Additionally, Dr. Gant performed Ms. Hawkins's formal cognitive evaluation to form an
opinion, (tr. 26), which the ALJ then evaluated, (tr. 29).

Ms. Hawkins also argues the ALJ failed to weigh the 2008 medical reports from Peter
Heinbecker, M.D., and Richard J. Ingebretsen, M.D., Ph.D.  (Pl.'s Opening Br. at 14, ECF No.
12.)  The ALJ did consider Dr. Heinbecker's and Dr. Ingebretsen's reports.  (Tr. 25 (referencing

-25-

Exhibit 2F which is Dr. Heinbecker's report at tr. 221–27); tr. 24 (referencing Exhibit 3F which is Dr. Ingebretsen's report at tr. 228–31).)  The ALJ noted that Ms. Hawkins's "mental health records were remote," (tr. 25), but did not weigh either report.  Although these reports date from spring 2008, and Ms. Hawkins alleged March 26, 2010 as her disability onset date, the ALJ needed to weigh Dr. Heinbecker's and Dr. Ingebretsen's opinions.  *See* 20 C.F.R. § 416.927(c). ("Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."); *Lackey v. Barnhart*, 127 F. App'x 455, 458 (10th Cir. 2005) ("No authority is cited for the proposition that medical reports prior to the operative onset date are categorically irrelevant and, indeed, our precedent is to the contrary." (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1223 n.15 (10th Cir. 2004)).

However, the ALJ's failure to assign weights to Dr. Heinbecker's and Dr. Ingebretsen's opinions constitutes harmless error because even if the ALJ did assign significant weights to both opinions, they would not change the ALJ's ultimate conclusion that Ms. Hawkins does not qualify as disabled under the Act.  *Fischer-Ross*, 431 F.3d at 733–34 ("Harmless error analysis 'nevertheless may be appropriate . . . where . . . [the Court] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.'" (citation omitted)); *Keyes-Zachary*, 695 F.3d at 1162–65 (holding the ALJ's failure to assign weights to various doctors' opinions could still constitute harmless error).  The reports do not reveal anything new that the ALJ did not already consider. Dr. Heinbecker's mental evaluation shows Ms. Hawkins had mood swings, poor memory, limited knowledge, and major depression, yet she shops, reads, watches TV, and could handle her own funds.  (Tr. 223–26.)  Dr. Ingebretsen's physical evaluation shows Ms. Hawkins has some difficulty walking but had normal range of motion in all areas and no tenderness anywhere

on her body.  (Tr. 230.)  Ms. Hawkins also reported doing her daily activities independently.

(Tr. 229.)  These opinions align with the ALJ's conclusion that Ms. Hawkins's impairments only

place, at most, mild limitations on her life.

Finally, Ms. Hawkins argues the ALJ failed to assign a specific weight to the findings of

the state agency consultants.  (Pl.'s Opening Br. 14, ECF No. 12.)  The Court disagrees.  The

ALJ considered the state agency consultants' findings and noted that they found Ms. Hawkins's

physical and mental impairments non-severe.  (Tr. 30.)  The ALJ implicitly rejected these

findings because "evidence received into the record since the reconsideration determination"

shows Ms. Hawkins has severe physical and mental impairments.  (*Id.*)  Thus, the ALJ did weigh

the state agency consultants' opinions.  "[T]he form of words should not obscure the substance

of what the ALJ actually did."  *Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003).

Remanding the Decision to require the ALJ to assign a specific weight to these opinions would

elevate form over substance.

## C.  *Evaluation of Ms. Hawkins's Credibility*

Third, Ms. Hawkins argues that the ALJ improperly evaluated her credibility.  (Pl.'s

Opening Br. 16–18, ECF No. 12.)  The Court disagrees.

"Credibility determinations are peculiarly the province of the finder of fact, and [a court]

will not upset such determinations when supported by substantial evidence."  *Kepler v. Chater*,

68 F.3d 387, 391 (10th Cir. 1995) (internal quotation marks and citation omitted).  "However,

'[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and

not just a conclusion in the guise of findings.'"  *Id.* (alteration in original) (citation omitted).  If

objective medical evidence shows a medical impairment that produces pain, the ALJ must

consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes

the claimant's assertions. *Id.* To make this analysis, the ALJ should consider such factors as

> the level of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation and relationship between the claimant and other witness, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993) (quoting *Hargis v. Sullivan*, 945

F.2d 1482, 1489 (10th Cir. 1991)). But this analysis "does not require a formalistic factor-by-

factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on

in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Qualls v. Apfel*, 206

F.3d 1368, 1372 (10th Cir. 2000).

Ms. Hawkins argues the ALJ "simply list[ed] the factors [required in evaluating a

claimant's testimony] and . . . state[d] that he . . . considered them" without giving any

explanations. (Pl.'s Opening Br. 17, ECF No. 12.) The Court disagrees. The ALJ gave several

reasons for partially discrediting Ms. Hawkins's testimony and supported each one. (Tr. 26–27.)

Even Ms. Hawkins admits the ALJ considered some of the factors required in evaluating her

testimony. (Pl.'s Opening Br. 17, ECF No. 12.)

First, the ALJ stated that Ms. Hawkins's daily activities exceed her purported limited

lifestyle. (Tr. 26.) The ALJ noted Ms. Hawkins has the ability to care for herself, do household

chores, prepare simple meals, watch TV, read, do crafts, sew, use public transportation, shop,

and handle her finances. (*Id.*) Ms. Hawkins argues the ALJ used "a few isolated symptom-free

instances and uses" to undermine her testimony, but substantial evidence in the record shows Ms.

Hawkins's daily activities have remained consistent over time. (Tr. 174, 274–75, 285–87.)

Second, the ALJ stated that Ms. Hawkins's complaints exceed the objective medical evidence in the record.  (Tr. 27.)  The ALJ acknowledged Ms. Hawkins's history of pain, mood disturbances, and learning disorders, but objective medical evidence, as laid out above, shows these impairments only limit Ms. Hawkins, at most, mildly.  The ALJ noted Ms. Hawkins does not fall as often as she reported; never had periods of hospitalization, surgery, or physical therapy; does not need help ambulating; and was never advised to significantly reduce her daily activities.  (Tr. 27.)

Third, the ALJ noted the huge gaps between Ms. Hawkins's doctor visits undercut her claims.  (*Id.*)  He found Ms. Hawkins waited eight months in between doctor visits for her physical complaints and fifteen months for her mental complaints.  (*Id.*)

Finally, the ALJ opined Ms. Hawkins's "failure to seek other forms of treatment in which she would not have to pay" belies her credibility.  (*Id.*)  The ALJ acknowledged Ms. Hawkins could not afford her treatment, but he also noted that Ms. Hawkins did not make any effort to find payment assistance or an alternative form of treatment.  (*Id.*)

Because the ALJ set forth specific evidence to support the determination of Ms. Hawkins's credibility, this Court finds no error in the ALJ's limiting of Ms. Hawkins's subjective complaints to those supported by objective medical evidence.  *See Qualls*, 206 F.3d at 1372 (holding the ALJ did not err in his credibility determination when he set forth the specific evidence he relied on in making his findings).

### D.  RFC Consideration

Ms. Hawkins contends the ALJ erred by providing no citations to specific facts or reasoning to support his RFC assessment.  (Pl.'s Opening Br. 18–20, ECF No. 12.)  Ms. Hawkins further argues that because the ALJ erred in his RFC assessment, he also erred in finding that

Ms. Hawkins has the ability to perform jobs available in the national economy.  (*Id.*)  The Court disagrees.

The RFC reflects the ability to do physical, mental, and other work activities on a sustained basis despite limitations from the claimant's impairments.  *See* 20 C.F.R. § 416.945.  The ALJ based his RFC assessment on his review of the record, including the doctors' opinions and Ms. Hawkins's testimony.  As laid out above, the ALJ carefully considered each doctor's opinion and Ms. Hawkins's testimony and modified Ms. Hawkins's RFC according to how much weight he gave each one.  (Tr. 23–30.)  Therefore, the ALJ did not err in his RFC assessment and thus did not err in his finding that Ms. Hawkins could still perform jobs available in the national economy despite her limitations.

### E.  Appeals Council

Finally, Ms. Hawkins argues the Appeals Council erred when it failed to consider her newly submitted evidence in its review of the Decision.  (Pl.'s Opening Br. 20, ECF No. 12.)  The Court disagrees.

Ms. Hawkins's newly submitted evidence includes a Medical Statement, (tr. 420–24), and a letter, (tr. 426), both written by Dr. Whitten after the Decision.  (Tr. 11.)  In the Medical Statement, Dr. Whitten diagnosed Ms. Hawkins with major depressive disorder, panic disorder, mild mental retardation, and reading, math, and writing disorders.  (Tr. 420.)  Dr. Whitten opined these limitations would prevent Ms. Hawkins from, among other things, understanding and remembering instructions, maintaining attention and concentration for extended periods of time, and adapting in a work environment.  (Tr. 420–21.)  In the letter, Dr. Whitten summarized Ms. Hawkins's physical impairments, mentioning Ms. Hawkins's "leg weakness and numbness," lower back pain, and generalized pain.  (Tr. 426.)

In its denial of Ms. Hawkins's request for review, the Appeals Council clearly stated it considered Ms. Hawkins's submissions:  "In looking at your case, we considered the reasons you disagree with the decision and *the additional evidence listed on the enclosed Order of Appeals Council*."  (Tr. 7 (emphasis added).)  The Order of Appeals Council lists both Dr. Whitten's Medical Statement and letter.  (Tr. 11.)  This representation satisfies the Court's inquiry.  *Martinez v. Barnhart*, 444 F.3d 1201, 1207 (10th Cir. 2006) (holding the Appeals Council's statement that it considered "'the additional evidence identified on the attached Order of the Appeals Council'" defeated claimant's argument that the Appeals Council failed to consider his submission).  Thus, Ms. Hawkins's argument fails.

Ms. Hawkins also argues, in the alternative, that even if the Appeals Council considered the newly submitted evidence, substantial evidence does not support the ALJ's key findings. (Pl.'s Opening Br. 20–21, ECF No. 12.)  As explained above, the Court finds substantial evidence supports the ALJ's findings even in light of the later submitted evidence.

## V.  CONCLUSION

After a complete review of the record and based on the foregoing, the Court AFFIRMS the Commissioner's decision.


DATED this 31st day of March, 2015.


BY THE COURT:


Evelyn J. Furse
United States Magistrate Judge